FILED
CLERK, U.S. DISTRICT COURT

JUL 26 2012

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

MONICA HUJAZI,                    )    NO. CV 11-1555-ODW(E)
                                  )
            Petitioner,           )
                                  )
      v.                          )    ORDER ACCEPTING FINDINGS,
                                  )
SUPERIOR COURT OF CALIFORNIA,     )    CONCLUSIONS AND RECOMMENDATIONS OF
COUNTY OF LOS ANGELES,            )
                                  )    UNITED STATES MAGISTRATE JUDGE
            Respondent.           )
                                  )
_____ )

    Pursuant to 28 U.S.C. section 636, the Court has reviewed the
Petition, all of the records herein and the attached Report and
Recommendation of United States Magistrate Judge.  The Court accepts
and adopts the Magistrate Judge's Report and Recommendation.


    IT IS ORDERED that Judgment be entered denying and dismissing the
Petition with prejudice.

///

///

///

///

1    IT IS FURTHER ORDERED that the Clerk serve copies of this Order,

2  the Magistrate Judge's Report and Recommendation and the Judgment

3  herein on counsel for Petitioner and counsel for Respondent.

4

5    LET JUDGMENT BE ENTERED ACCORDINGLY.

6

7    DATED:    July 26            , 2012.

8

9

10    _____
           OTIS D. WRIGHT II
11    UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                     CENTRAL DISTRICT OF CALIFORNIA

10

11   MONICA HUJAZI,                    )     NO. CV 11-1555-ODW(E)
                                       )
12                  Petitioner,        )
                                       )
13        v.                           )     REPORT AND RECOMMENDATION OF
                                       )
14   SUPERIOR COURT OF CALIFORNIA,     )     UNITED STATES MAGISTRATE JUDGE
     COUNTY OF LOS ANGELES,            )
15                                     )
                    Respondent.        )
16                                     )
                                       )
17   _____)

18        This Report and Recommendation is submitted to the Honorable

19   Otis D. Wright II, United States District Judge, pursuant to 28 U.S.C.

20   section 636 and General Order 05-07 of the United States District

21   Court for the Central District of California.

22

23                            PROCEEDINGS

24

25        Petitioner filed a "Petition for Writ of Habeas Corpus By a

26   Person in State Custody" on February 22, 2011.  The Petition asserted

27   that: (1) the trial court denied Petitioner the right to put on a

28   defense by allegedly finding that the subject offenses are "strict

1  liability" offenses under California law (Ground One); and

2  (2) Petitioner's trial counsel allegedly rendered ineffective

3  assistance (Ground Two).  On May 23, 2011, Respondent filed an Answer

4  and a Memorandum of Points and Authorities in support thereof,

5  asserting, inter alia, that Ground Two is unexhausted.  On August 16,

6  2011, Petitioner filed a "Notice of Withdrawal of Cause of Action,"

7  which withdrew Ground Two.  Petitioner filed a Reply on September 13,

8  2011.

9

10  In accordance with the Court's September 15, 2011 Order,

11  Respondent filed a Supplemental Answer on January 31, 2012.

12  Petitioner filed a Supplemental Reply on May 16, 2012.

13

14  **BACKGROUND**

15

16  On May 29, 2008, a Los Angeles County Superior Court jury found

17  Petitioner guilty of 39 counts of violating Los Angeles Municipal and

18  County Building, Fire, and Health and Safety Codes regarding her

19  maintenance of the apartment building located at 621 South Union

20  Avenue (Reporter's Transcript ["R.T."], pp. 405, 479-84, 489).[1]  The

21  _____

22  [1]  The jury found Petitioner not guilty on 12 charged
counts (R.T. 480-83).  The counts on which the jury found
23  Petitioner guilty charged, inter alia: (1) failure to provide
smoke detectors; (2) failure to maintain walls and ceilings,
24  floors, flooring, windows, doors, plumbing, electrical, fire
safety doors, insect screens, guard rails, bathtubs, sinks,
25  cabinets, stair treads, exit signs, and a stairway identification
numbering system; (3) failure to abate mold and mildew;
26  (4) failure to provide an operational elevator; (5) failure to
27  maintain at least one hour fire occupancy separation;
(6) maintaining an unpermitted laundry area; (7) maintaining ABS
28  (continued...)

1    trial court suspended Petitioner's sentence and placed Petitioner on

2    36 months of summary probation with conditions, <u>inter alia</u>, that

3    Petitioner serve 30 days in jail, perform 300 hours of community

4    service, and pay a fine (R.T. 699-701).

5

6       On November 6, 2009, the Los Angeles County Superior Court

7    Appellate Division affirmed the judgment in a reasoned decision

8    (Respondent's Lodgment 7).   On November 25, 2009, the Appellate

9    Division summarily denied Petitioner's "Petition for Rehearing and for

10    Transfer to the Court of Appeal" (Respondent's Lodgments 8-9).

11

12       Petitioner filed a "Petition for Writ of Prohibition/Mandate" in

13    the California Court of Appeal, which the Court of Appeal summarily

14    denied on December 29, 2009 (Respondent's Lodgments 11-12).

15    Petitioner filed a "Petition for Writ of Review (Certiorari)" in the

16    California Supreme Court, which that court summarily denied on

17    February 10, 2010 (Respondent's Lodgments 13-14).   Petitioner

18    petitioned for a writ of certiorari to the United States Supreme

19    Court, which that court summarily denied on May 3, 2010 (Respondent's

20

21    _____

      [1](...continued)

22    piping in a building over two stories in height; (8) maintaining
a sleeping room lacking an emergency escape door and window;

23    (9) failure to keep the premises free from infestation by
insects, vermin and/or rodents, and permitting occupancy where

24    the condition of the building permitted breeding and harborage of
rodents, fleas, bedbugs, cockroaches, lice, mosquitos, and other

25    vermin; (10) failure to maintain the premises free from
accumulation of waste; and (11) failure to identify fire

26    department inlet connections.   <u>See</u> Respondent's Lodgment 2,

27    Document 4 (Amended Misdemeanor Complaint); R.T. 479-83
(verdicts); <u>see also</u> Respondent's Lodgment 7 at 3 n.1 (detailing

28    convictions).

Case 2:11-cv-01555-ODW -E  Document 52-1  Filed 06/07/12  Page 4 of 30  Page ID #:250

1  Lodgments 15-16).

2

3      Thereafter, Petitioner filed habeas corpus petitions in the Los

4  Angeles County Superior Court and California Court of Appeal, and a

5  petition for review in the California Supreme Court, each alleging

6  ineffective assistance of trial counsel (Respondent's Lodgments 17-18,

7  20, 22, 24).  The state courts denied all of these petitions

8  (Respondent's Lodgments 19, 21, 23, 25).

9

10                          **SUMMARY OF TRIAL EVIDENCE**

11

12      The following factual summary is taken from the opinion of the

13  Los Angeles County Superior Court Appellate Division in People v.

14  Hujazi (Respondent's Lodgment 7).  See Galvan v. Alaska Dep't of

15  Corrections, 397 F.3d 1198, 1199 & n.1 (9th Cir. 2005) (taking factual

16  summary from Court of Appeal opinion).

17

18          [Petitioner] owned, operated, and controlled a 68-unit

19      residential apartment building located at 621 S. Union

20      Avenue in Los Angeles.  Initially, [Petitioner] was charged

21      with over 100 violations of the law. . . .  The causes

22      proceeded to trial on 51 counts that alleged various

23      building, fire, electrical, plumbing and health violations

24      on dates falling within the time period from June 19, 2007,

25      through August 22, 2007.

26

27                              *  *  *

28  ///

4

1    The prosecution's case consisted of the testimony of

2    Brian Beltran, an inspector for the Los Angeles Housing

3    Department, Calvin Morris, an inspector for the Los Angeles

4    County Health Department, and Andrew Gutierrez, an inspector

5    for the Los Angeles County Fire Department.  All inspectors

6    were members of the Interagency Task Force that focused on

7    substandard buildings.  Each inspector testified regarding

8    the various violations found during his respective

9    inspection of the building on various dates within the time

10    periods alleged in the complaint.  The charges were based

11    upon violations discovered during one inspection and not

12    corrected by a later inspection, and upon new violations

13    found during a subsequent inspection.

14

15  (Respondent's Lodgment 7, pp. 1-2).

16

17                      **STANDARD OF REVIEW**

18

19    Under the "Antiterrorism and Effective Death Penalty Act of 1996"

20  ("AEDPA"), a federal court may not grant an application for writ of

21  habeas corpus on behalf of a person in state custody with respect to

22  any claim that was adjudicated on the merits in state court

23  proceedings unless the adjudication of the claim: (1) "resulted in a

24  decision that was contrary to, or involved an unreasonable application

25  of, clearly established Federal law, as determined by the Supreme

26  Court of the United States"; or (2) "resulted in a decision that was

27  based on an unreasonable determination of the facts in light of the

28  evidence presented in the State court proceeding."  28 U.S.C. §

5

1  2254(d); Woodford v. Visciotti, 537 U.S. 19, 24-26 (2002); Early v.

2  Packer, 537 U.S. 3, 8 (2002); Williams v. Taylor, 529 U.S. 362, 405-09

3  (2000).   This standard of review is "highly deferential" and

4  "difficult to meet."   Harrington v. Richter, 131 S. Ct. 770, 786

5  (2011); Woodford v. Visciotti, 537 U.S. at 24.   "The petitioner

6  carries the burden of proof."   Cullen v. Pinholster, 131 S. Ct. 1388,

7  1398 (2011).

8

9        "Clearly established Federal law" refers to the governing legal

10 principle or principles set forth by the Supreme Court at the time the

11 state court renders its decision.   Lockyer v. Andrade, 538 U.S. 63

12 (2003).   A state court's decision is "contrary to" clearly established

13 Federal law if: (1) it applies a rule that contradicts governing

14 Supreme Court law; or (2) it "confronts a set of facts. . . materially

15 indistinguishable" from a decision of the Supreme Court but reaches a

16 different result.   See Early v. Packer, 537 U.S. at 8 (citation

17 omitted); Williams v. Taylor, 529 U.S. at 405-06.

18

19       Under the "unreasonable application prong" of section 2254(d)(1),

20 a federal court may grant habeas relief "based on the application of a

21 governing legal principle to a set of facts different from those of

22 the case in which the principle was announced."   Lockyer v. Andrade,

23 538 U.S. at 76 (citation omitted); see also Woodford v. Visciotti, 537

24 U.S. at 24-26 (state court decision "involves an unreasonable

25 application" of clearly established federal law if it identifies the

26 correct governing Supreme Court law but unreasonably applies the law

27 to the facts).   A state court's decision "involves an unreasonable

28 application of [Supreme Court] precedent if the state court either

6

1  unreasonably extends a legal principle from [Supreme Court] precedent

2  to a new context where it should not apply, or unreasonably refuses to

3  extend that principle to a new context where it should apply."

4  Williams v. Taylor, 529 U.S. at 407 (citation omitted).

5

6      "In order for a federal court to find a state court's application

7  of [Supreme Court] precedent 'unreasonable,' the state court's

8  decision must have been more than incorrect or erroneous."  Wiggins v.

9  Smith, 539 U.S. 510, 520 (2003) (citation omitted).  "The state

10  court's application must have been 'objectively unreasonable.'"  Id.

11  at 520-21 (citation omitted); see also Waddington v. Sarausad, 555

12  U.S. 179, 190 (2009); Davis v. Woodford, 384 F.3d 628, 637-38 (9th

13  Cir. 2004), cert. dism'd, 545 U.S. 1165 (2005).  "Under § 2254(d),

14  a habeas court must determine what arguments or theories supported,

15  . . . or could have supported, the state court's decision; and then it

16  must ask whether it is possible fairminded jurists could disagree that

17  those arguments or theories are inconsistent with the holding in a

18  prior decision of this Court."  Harrington v. Richter, 131 S. Ct. at

19  786.  This is "the only question that matters under § 2254(d)(1)."

20  Id. (citation and internal quotations omitted).  Habeas relief may not

21  issue unless "there is no possibility fairminded jurists could

22  disagree that the state court's decision conflicts with [the United

23  States Supreme Court's] precedents."  Id. at 786-87 ("As a condition

24  for obtaining habeas corpus from a federal court, a state prisoner

25  must show that the state court's ruling on the claim being presented

26  in federal court was so lacking in justification that there was an

27  error well understood and comprehended in existing law beyond any

28  possibility for fairminded disagreement.").

7

1    In applying these standards, the Court looks to the last reasoned

2  state court decision.  See DeWeaver v. Runnels, 556 F.3d 995, 997 (9th

3  Cir.), cert. denied, 130 S. Ct. 183 (2009).  Here, the last reasoned

4  state court decision addressing the merits of Ground One is the

5  Appellate Division decision on direct appeal.  (Respondent's Lodgment

6  7).

7

8                              DISCUSSION

9

10  I.   **Petitioner's Claim that the Trial Court Denied Her**

11       **the Right to Put on a Defense Does Not Merit Habeas Relief.**

12

13    Petitioner claims that the trial court denied her the right to

14  put on a defense by ruling that the charged offenses were "strict

15  liability" offenses under California law (Petition, Ground One; Reply,

16  p. 2).  Specifically, Petitioner argues that the trial court prevented

17  her from attempting to prove that her tenants had caused the subject

18  conditions at the property, either by destroying the property or by

19  destroying Petitioner's repairs to the property (Reply, p. 2).  As

20  discussed below, Petitioner's argument does not merit habeas relief.

21

22       A.   **The Trial Court's Rulings**

23

24    Prior to the start of trial, the trial court addressed with

25  counsel whether the jury instructions would include the word "willful"

26  (R.T. 27-30).  The prosecution argued under People v. Bachrach, 114

27  Cal. App. 3d Supp. 8, 170 Cal. Rptr. 773 (Cal. App. Super. 1980)

28  ("Bachrach"), that the court should delete any willfulness language

                                    8

1  from the instructions because the offenses assertedly were strict

2  liability offenses (R.T. 28-30).[2]   Petitioner's counsel argued that

3

4      [2]     In Bachrach, a defendant landlord had been convicted of
   Los Angeles Municipal Code public safety and fire prevention
5  violations for failure to provide exit signs, failure to secure a
   vacant building, failure to provide a garbage bin with heat
6  activated closing devices, maintaining an antenna less than seven
   feet high on an accessible roof, failure to maintain a fire door,
7  failure to correct hazardous conditions after notice, and failure
   to have a wet standpipe system tested within a five-year period.
8  Bachrach, 114 Cal. App. 3d Supp. at 12 n.2, 170 Cal. Rptr. at 775
   n.2.  In affirming the conviction, the Los Angeles County
9  Superior Court Appellate Department found that the violations
   were strict liability offenses, designed to protect the safety of
10  tenants.  The Bachrach court explained:

11

12        The [trial] court correctly instructed the jury that
         intent was not an element of any of the offenses with
13        which the defendant was charged.  These offenses being,
         as they are, against the public health and safety and
14        against the public welfare, do not require proof of
         intent nor criminal negligence, but are governed by
15        rules of "strict liability."  The rationale given for
         imposing strict liability to the proscribed acts
16        include the following:  Statutes of this nature are
         primarily concerned with the protection of the public
17        and not with the punishment and correction of
         offenders.
18

19                          * * *

20        Whether a legislative body intended the doctrine of
         strict liability to apply to a given statute is
21        determined by the subject matter, the language, the
         evil sought to be prevented by the enactment of the
22        statute.  From the subject matter, the language, and
         the purpose of the laws which the jury found the
23        defendant violated, the legislative intent in their
         enactment is clear.  These laws were adopted to protect
24        the lives and property of persons in crowded
         apartments.  While these laws impose obligations upon
25        apartment house owners such as the defendant "[he]. . .
26        is in a position to prevent [the violations] with no
         more care than society might reasonably expect and no
27        more exertion than it might reasonably exact from one

28                                        (continued...)

                              9

1  such a ruling would prevent Petitioner from presenting her case to the

2  jury and essentially would direct a verdict (R.T. 38, 40-41).

3

4     The trial court found that Petitioner's case, like <u>Bachrach</u>,

5  involved the "type of regulatory and public health-and-safety-type

6  ordinances" that define strict liability offenses (R.T. 36, 41).  The

7  court observed that the subject codes make no mention of any

8  willfulness or knowledge elements.  <u>Id.</u>[3]  The trial court therefore

9  removed all intent or knowledge elements from the jury instructions

10  (R.T. 41-42; <u>see also</u> R.T. 48 ("the issue in this case is really just

11  going to be whether or not a condition existed, regardless of the

12  defendant's intent, motive"); R.T. 97 (trial court instructing the

13  jury that intent or other mental state need not be proven)).  The

14  trial court stated that the strict liability nature of the offenses

15  would not prevent the defense from putting on a defense, but would

16

17  _____

18     [2](...continued)
       who assumed his responsibilities."

19  <u>Bachrach</u>, 114 Cal. App. 3d Supp. at 12-13; 170 Cal. Rptr. at 775-
20  76 (internal footnote and citations omitted; quoting <u>Morissette</u>
    <u>v. United States</u>, 342 U.S. 246, 256 (1952)).

21
       [3]     This Court's review of the applicable Los Angeles
22  County Code and Los Angeles Municipal Code sections available
    online at http://search.municode.com/html/16274/index.htm and
23  http://www.amlegal.com/nxt/gateway.dll?f=templates&fn=default.htm
    &vid=amlegal:lamc_ca (last visited Jan. 12, 2012), respectively,
24  confirms the trial court's observation.  There is no suggestion
    in these codes that conviction of a misdemeanor for violating the
25  codes requires that the violation have been willful.  <u>See, e.g.,</u>
26  Los Angeles County Code § 1.24.010 (defining violations as
    misdemeanors); Los Angeles Municipal Code § 57.20.41(E)
27  (providing punishment for violating the requirement for
    operational fire assembly doors); Los Angeles Municipal Code §
28  57.33.15(F) (same for failing to provide proper exit signs).

Case 2:11-cv-01555-ODW-E   Document 59   Filed 07/26/12   Page 13 of 29   Page ID #:342
Case 2:11-cv-01555-ODW -E   Document 52-1   Filed 06/07/12   Page 11 of 30   Page ID
#:257

1  "just change[] the nature of the defense." See R.T. 41 (stating that

2  Petitioner remained "free to attack the factual allegations of whether

3  or not any of these charges occurred").

4

5      Petitioner's counsel proffered that Petitioner would be

6  presenting an objective impossibility defense under United States v.

7  Park, 421 U.S. 658 (1975) (discussed infra), i.e., that her tenants

8  assertedly prevented her from making the appropriate repairs to the

9  property.[4]  The trial court reserved ruling on the viability of such a

10  defense until after presentation of the prosecution's case (R.T. 44-

11  45).

12

13      During the presentation of the prosecution's case, Petitioner's

14  counsel questioned the inspector witnesses in a manner suggesting that

15  the inspectors did not know whether the tenants intentionally

16  destroyed or damaged the property inspected, or whether the tenants

17  otherwise were responsible for the code violations.  See R.T. 202-05,

18
   _____
19      [4]    Counsel explained:

20      What we're talking about . . . would be when tenants
       refuse not only the carpet individuals to come in and
21      lay new carpet, but the tenants also, within a week,
       destroyed the new carpet.  In addition to that, there
22      will be testimony that new screens were put up on many
       occasions and within a day or two, and no more than a
23      week, they were either ripped, torn out or discarded.

24  (R.T. 42-43).  When asked how the tenant behavior would relate to
    an objective impossibility defense, Petitioner's counsel
25  explained: "[O]nce you put it in, the tenants then take it out.
    . . .  [W]hen you have the carpet people being refused access,
26  when you have the exterminators being refused access, and we'll
    have testimony from several exterminator companies that the
27  tenants would not grant them permission to enter and spray."
    (R.T. 43).
28

Case 2:11-cv-01555-ODW-E   Document 59   Filed 07/26/12   Page 14 of 29   Page ID #:343
Case 2:11-cv-01555-ODW -E   Document 52-1   Filed 06/07/12   Page 12 of 30   Page ID
#:258

237-39.   The prosecution objected to the causation evidence and, after

lengthy argument (see R.T. 239-48), the trial court ruled that

testimony concerning the cause of the violations was not relevant,

given the strict liability nature of the offenses (R.T. 248-50).

When the jury returned, the trial court instructed:

      [I]f you recall, yesterday we shut things down during

   cross-examination by [Petitioner's counsel] during questions

   such as, did Mr. Beltran make any determination as to the

   cleanliness of particular units and how many people were

   living in units and so forth.  And so what I want to explain

   to you is that the issue of causation has been – well, for

   these types of allegations in this case, the issue of

   causation is not relevant as to what caused the condition.

      So there are two elements to be proved: Number 1, that

   Ms. Hujazi is the responsible party for the property in

   question; and, Number 2, whether or not the condition

   existed.  So whether or not the condition was caused by a

   third party or tenant is not relevant.  So, at this time,

   the questions and answers that you did hear before we

   started discussing this yesterday are stricken from the

   record.

///

///

///

///

12

1  (R.T. 254-55).[5]

2

3      Prior to the start of the defense case, Petitioner's counsel

4  requested confirmation that the trial court would not be permitting

5  the defense to argue that tenants caused the damage to the building

6  (R.T. 354-55).  The trial court responded that a causation defense

7  (which would not be allowed) was different from an objective

8  impossibility defense predicated on an inability to cure the

9  violations because of tenant conduct.  According to the court, such an

10 impossibility defense would require something "closer to

11 [Petitioner's] utter powerlessness to prevent the condition" (R.T.

12 391-93).  When the court requested an offer of proof on the intended

13 defense, Petitioner's counsel proffered that managers and contractors

14 would testify that tenants were destroying property that Petitioner

15 was trying to repair (R.T. 393-94).  The trial court ruled that

16 Petitioner had not proffered substantial evidence of her own

17 powerlessness sufficient to support an impossibility defense (R.T.

18 ///

19 ///

20 ///

21 ///

22 ///

23 ///

24

25      [5]    Consistent with Petitioner's proffered defense,
26 Petitioner's counsel continued cross-examination by asking the
   inspector if items he observed on reinspection were new but had
27 been damaged (R.T. 259-60).  Counsel also cross-examined the
   inspector concerning whether tenant cooperation was necessary to
28 accomplish adequate pest control (R.T. 345-47).

Case 2:11-cv-01555-ODW-E  Document 59  Filed 07/26/12  Page 16 of 29  Page ID #:345
Case 2:11-cv-01555-ODW -E  Document 52-1  Filed 06/07/12  Page 14 of 30  Page ID
#:260

1  395, 409).[6]  The defense then rested (R.T. 395).

2

3  **B.  The State Court Decision on Appeal**

4

5      On direct appeal, Petitioner challenged the trial court's finding

6  that the offenses were strict liability offenses and the court's

7  asserted preclusion of Petitioner's alleged impossibility defense.

8  See Respondent's Lodgment 4, pp. 8-18; Respondent's Lodgment 6.  The

9  Los Angeles County Superior Court Appellate Division rejected these

10  challenges (Respondent's Lodgment 7, pp. 4-11).  The Appellate

11  Division found that the trial court committed no error in concluding

12  that the offenses were strict liability offenses under California law.

13  (Id. at 4-7).  The Appellate Division also found no violation of

14  Petitioner's right to present a defense, reasoning that Petitioner's

15  proffered evidence did not constitute substantial evidence that

16  _____

17      [6]    The trial court stated:

18      I understand that the building. . . was a difficult
        building with difficult tenants.  But I don't think
19      there's any apartment building out there that does not
        have difficult tenants.  And I don't think it's ever
20      easy to run an apartment building or own an apartment
        building.  But the fact remains that it is the
21      responsibility of the owner to bring the property into
        compliance.  And whether that is difficult or even
22      impossible due to actions of the tenants is really no
        matter.  And it's incumbent upon the owner to deal with
23      those tenants and take actions that are necessary to
        bring the property into compliance and comply with the
24      law. . . .  I don't find that there is any evidence
        before me that any efforts were taken to either evict
25      the problem tenants. . . or, at the very least, issue
        them letters indicating that their apartments would be
26      entered and work would be done.
27
28  (R.T. 698-99) (emphasis added).

Case 2:11-cv-01555-ODW-E   Document 59   Filed 07/26/12   Page 17 of 29   Page ID #:346
Case 2:11-cv-01555-ODW -E   Document 52-1   Filed 06/07/12   Page 15 of 30   Page ID
#:261

1  Petitioner did all that was objectively possible to "discover, prevent

2  and remedy" the violations (Respondent's Lodgment 7 at 9-11).  Because

3  Petitioner's evidence was inadequate as a matter of law, the Appellate

4  Division ruled the trial court's exclusion of the evidence as

5  irrelevant did not implicate Petitioner's constitutional rights

6  (Respondent's Lodgment 7 at 10-11).

7

8      C.    **Analysis**

9

10      As previously stated, this Court may grant the Petition only if

11  the state court adjudication (1) resulted in a decision that was

12  "contrary to," or involved an "unreasonable application of, clearly

13  established federal law as determined by the Supreme Court"; or (2)

14  resulted in a decision that was based on an unreasonable determination

15  of the facts in light of the evidence presented to the state court.

16  See 28 U.S.C. § 2254(d); see also Harrington v. Richter, 131 S. Ct.

17  770, 786 (2011).  Thus, to the extent Petitioner may be claiming that

18  the trial court rulings violated California law, Petitioner is not

19  entitled to habeas relief.  See Wilson v. Corcoran, 131 S. Ct. 13, 16

20  (2010) ("it is only noncompliance with federal law that renders a

21  State's criminal judgment susceptible to collateral attack in the

22  federal courts") (original emphasis); Estelle v. McGuire, 502 U.S. 62,

23  67-68 (1991) (mere errors in the application of state law are not

24  cognizable on federal habeas review).  The Appellate Division found

25  that the trial court did not err in finding that the charged crimes

26  were strict liability crimes and in instructing the jury accordingly

27  (Respondent's Lodgment 7, pp. 4-11).  It is not for this Court to

28  reexamine the state court's determination on this state law issue.

15

1  See Waddington v. Sarausad, 555 U.S. 179, 192 n.5 (2009) ("we have

2  repeatedly held that it is not the province of a federal habeas court

3  to reexamine state-court determinations on state-law questions")

4  (citation and internal quotations omitted); Bradshaw v. Richey, 546

5  U.S. 74, 76 (2005) ("a state court's interpretation of state law,

6  including one announced on direct appeal of the challenged conviction,

7  binds a federal court sitting in habeas corpus"); see also Holgerson

8  v. Knowles, 309 F.3d 1200, 1202 (9th Cir. 2002), cert. denied, 538

9  U.S. 1005 (2003) (federal habeas court "bound by California's

10  interpretation of its state law") (citation omitted); Garrison v.

11  Trombley, 2009 WL 311102, at *9 (E.D. Mich. Feb. 9, 2009) (federal

12  habeas court bound by state court's interpretation of state law as

13  imposing "strict criminal liability").

14

15      To the extent Petitioner may claim that the trial court's rulings

16  violated federal law, Petitioner also is not entitled to habeas

17  relief.  Petitioner has cited no clearly established United States

18  Supreme Court decisional law, and this Court has found none,

19  determining the per se unconstitutionality of strict liability

20  offenses or the unconstitutionality of strict liability offenses like

21  the ones here involved.  To the contrary, in Morissette v. United

22  States, 342 U.S. 246, 255 (1952) ("Morissette"), the Supreme Court

23  recognized that strict liability often is imposed for "public welfare

24  offenses," i.e., offenses that are "in nature of neglect where the law

25  requires care, or inaction where it imposes a duty."  Id.  As the

26  Ninth Circuit has explained:

27  ///

28  ///

1     The [Morissette] Court developed the exception for public

2     welfare offense from the statutory presumption of mens rea

3     because of hazards arising out of the Industrial Revolution,

4     which created "dangers [that] have engendered increasingly

5     numerous and detailed regulations which heighten the duties

6     of those in control of particular industries, trades,

7     properties or activities that affect public health, safety

8     or welfare."

9

10    Humanitarian Law Project v. U.S. Dept. of Justice, 352 F.3d 382, 402

11    n.14 (9th Cir. 2003), vacated on other grounds by, 393 F.3d 902 (9th

12    Cir. 2004) (quoting Morissette, 342 U.S. at 254; emphasis added).

13

14        The fact that lawmakers have "sought to make such regulations

15    more effective by invoking criminal sanctions to be applied by the

16    familiar technique of criminal prosecutions and convictions" has not

17    rendered these regulations unconstitutional.  Morissette, 342 U.S. at

18    254-60 (discussing with approval state regulatory cases that have

19    abandoned the "ingredient of intent," but conceding that no precise

20    criteria have been set forth for distinguishing between crimes that

21    require a "mental element" and crimes that do not); Staples v. United

22    States, 511 U.S. 600, 607 n.3 (1994) ("[W]e have referred to public

23    welfare offenses as 'dispensing with' or 'eliminating' a mens rea

24    requirement or 'mental element' and have described them as strict

25    liability crimes.  While use of the term 'strict liability' is really

26    a misnomer, we have interpreted statutes defining public welfare

27    offenses to eliminate the requirement of mens rea; that is, the

28    requirement of a 'guilty mind' with respect to an element of the

17

Case 2:11-cv-01555-ODW-E   Document 59   Filed 07/26/12   Page 20 of 29   Page ID #:349
Case 2:11-cv-01555-ODW -E   Document 52-1   Filed 06/07/12   Page 18 of 30   Page ID
#:264

1   crime.   Under such statutes we have not required that the defendant

2   know the facts that make his conduct fit the definition of the

3   offense.") (citing, inter alia, Morissette, 342 U.S. at 250, 263); see

4   also United States v. Dotterweich, 320 U.S. 277, 280-81 (1943) (such

5   legislation acts "in the interest of the larger good [by putting] the

6   burden of acting at hazard upon a person otherwise innocent but

7   standing in responsible relation to a public danger"); United States

8   v. Hanousek, 176 F.3d 1116, 1121 (9th Cir. 1999), cert. denied, 528

9   U.S. 1102 (2000) ("It is well established that a public welfare

10  statute may subject a person to criminal liability for his or her

11  ordinary negligence without violating due process.") (citations

12  omitted); People v. Vurckio, 162 Misc. 2d 876, 880, 619 N.Y.S. 2d 510,

13  512 (N.Y. City Crim. Ct. 1994) ("Since the turn of the [20th] century,

14  state courts have discontinued inquiry into 'intent' in a limited

15  class of offenses, such as labor law and building code violations.").[7]

16  _____

17   [7]   Petitioner argues that the Supreme Court has "severely
    narrowed" Morissette, citing Smith v. California, 361 U.S. 147
18  (1959) ("Smith") and Carella v. California, 491 U.S. 263 (1989)
    ("Carella") (Petition, Ground One; Reply, p. 3; Supplemental
19  Reply, p. 3).   Petitioner's argument is unpersuasive.   In Smith,
    the Supreme Court struck down as unconstitutional a Los Angeles
20  Municipal Code provision imposing strict liability on a
    bookseller possessing obscene material, finding that the
21  ordinance's failure to require any knowledge on the part of the
    bookseller would impose a "severe limitation" on the public's
22  access to constitutionally-protected expression.   Smith, 361 U.S.
    at 153-55.   Smith did not undermine the rationale of Morissette
23  that strict liability is permissible for public welfare offenses
    that concern public health, safety or welfare without implicating
24  freedom of expression.   See Smith, 361 U.S. at 153 (contrasting
    the unconstitutional booksellers ordinance with food and drug
25  legislation which involves a public interest "so great" as to
    "warrant the imposition of the highest standard of care on
26  distributors").
27
28                                                      (continued...)

18

Case 2:11-cv-01555-ODW-E  Document 59  Filed 07/26/12  Page 21 of 29  Page ID #:350
Case 2:11-cv-01555-ODW -E  Document 52-1  Filed 06/07/12  Page 19 of 30  Page ID
#:265

1   There is no clearly established Supreme Court law defining the

2   precise criteria courts should employ in determining which crimes

3   constitutionally require a mental element and which crimes do not.

4   See Morissette, 342 U.S. at 260; see also Powell v. State of Texas,

5   392 U.S. 514, 535 (1968) ("this Court has never articulated a general

6   constitutional doctrine of mens rea").  Because of this lack of

7   clarity, and the case law permitting strict liability under similar

8   public welfare regulations, the state courts were not unreasonable in

9   rejecting Petitioner's constitutional claims.[8]  Thus, habeas relief is

10

11       [7](...continued)
        The Carella decision is even more inapposite than Smith.  In

12  Carella, the Supreme Court found unconstitutional "mandatory"
    jury instructions that "directly foreclosed independent jury

13  consideration of whether the facts proved established certain
    elements of the [charged] offenses."  Carella, 491 U.S. at 266.

14  The instructions provided that intent to commit theft by fraud is
    presumed in certain circumstances, when such intent was a

15  specific element of the charged crime.  Id. at 264.  Here, unlike
    in Carella, the trial court found that intent was not an element

16  of the charged offenses.  Carella does not invalidate strict
    liability offenses or otherwise undermine Morissette.

17

18       [8]    Buttressing this conclusion are Supreme Court
    pronouncements underscoring the importance to the public welfare

19  of code provisions such as those involved in the present case.
    In Morissette, the Supreme Court noted that "[c]ongestion in

20  cities and crowding of quarters called for health and welfare
    regulations undreamed of in simpler times."  Morissette, 342 U.S.

21  at 254.  In Frank v. State of Md., 359 U.S. 360, 371-72 (1959)
    (overruled on other grounds by Camara v. Municipal Court of City

22  and County of San Francisco, 387 U.S. 523 (1967)), which upheld
    warrantless inspections of dwellings for enforcement of city

23  health codes, the Supreme Court stated:

24

25       The need to maintain basic, minimal standards of
         housing, to prevent the spread of disease and of that

26       pervasive breakdown in the fiber of a people which is
         produced by slums and the absence of the barest

27       essentials of civilized living, has mounted to a major
         concern of American government.  The growth of cities,

28                                               (continued...)

1 | unavailable.  See 28 U.S.C. § 2254(d); Feliciano v. McNeil, 2009 WL

2 | 1971635, at *15 (N.D. Fla. July 6, 2009) ("Given the lack of clearly

3 | established Supreme Court precedent on the criteria for determining

4 | when criminal intent is required and when it is not, this court cannot

5 | say that the state court's denial of relief on this claim is contrary

6 |

7 | [8](...continued)

8 | the crowding of populations, the increased awareness of
the responsibility of the state for the living
conditions of its citizens, all have combined to create

9 | problems of the enforcement of minimum standards. . . .
Time and experience have forcefully taught that the

10 | power to inspect dwelling places. . . is of
indispensable importance to the maintenance of

11 | community health. . . .

12 |     Petitioner's citations of United States v. Park, 421 U.S.

13 | 658 (1975) ("Park") and Staples v. United States, 511 U.S. 600
(1994) do not alter the Court's conclusion.  Petitioner suggests

14 | that these cases clearly establish that whether a crime requires
a mental element depends on whether the harm sought to be

15 | prevented is imminent or inherent (in which case no mental
element would apply), or merely a possibility (in which case a

16 | mental element would apply).  See Supplemental Reply, pp. 4-5.
The cited cases establish no such principle.  The Park case,

17 | discussed further infra, concerned whether the manager of a

18 | corporation and the corporation itself could be held strictly
liable for Federal Food, Drug and Cosmetic Act violations.  The

19 | Park Court stated that the regulations at issue dispensed with
the conventional requirement for awareness of some wrongdoing

20 | because the regulations "touch phases of the lives and health of
people which, in the circumstances of modern industrialism, are

21 | largely beyond self-protection."  See Park, 421 U.S. at 668

22 | (quoting United States v. Dotterweich, 320 U.S. at 280).  The
Park Court said nothing about imminence or inherence of harm

23 | being a touchstone with respect to the absence or presence of a
mental element requirement.  In Staples v. United States, the

24 | Supreme Court expressly declined to establish any rule regarding
when crimes may or must require a mental element.  See Staples v.

25 | United States, 511 U.S. at 619-20 ("As we noted in Morissette:

26 | 'Neither this Court nor, so far as we are aware, any other has
undertaken to delineate a precise line or set forth comprehensive

27 | criteria for distinguishing between crimes that require a mental
element and crimes that do not.'  We attempt no definition here,

28 | either.") (internal citation omitted).

1  to clearly established federal law"; habeas relief denied to

2  petitioner who had been convicted of statutory rape without fault and

3  sentenced to more than seven years in prison); see also Tart v.

4  Commonwealth of Massachusetts, 949 F.2d 490, 503 (1st Cir. 1991)

5  (rejecting constitutional challenge to criminal statute imposing

6  strict liability for landing raw fish without a commercial fishing

7  permit).

8

9       Petitioner's assertion that trial court rulings deprived her of

10 the right to present a defense is similarly unavailing.  "Whether

11 rooted directly in the Due Process Clause of the Fourteenth Amendment,

12 or in the Compulsory Process or Confrontation clauses of the Sixth

13 Amendment, the Constitution guarantees criminal defendants a

14 meaningful opportunity to present a complete defense."  Holmes v.

15 South Carolina, 547 U.S. 319, 324 (2006) (citations and internal

16 quotations omitted); Chambers v. Mississippi, 410 U.S. 284, 302 (1973)

17 ("Chambers"); Chia v. Cambra, 360 F.3d 997, 1003 (9th Cir. 2004),

18 cert. denied, 544 U.S. 919 (2005) ("The Supreme Court has made it

19 clear that the erroneous exclusion of critical, corroborative defense

20 evidence may violate both the Fifth Amendment due process right to a

21 fair trial and the Sixth Amendment right to present a defense.")

22 (citations and internal quotations omitted).  However, "Chambers . . .

23 does not stand for the proposition that the defendant is denied a fair

24 opportunity to defend himself whenever a state . . . rule excludes

25 favorable evidence."  United States v. Sheffer, 523 U.S. 303, 316

26 (1998).

27 ///

28 ///

1    "While the Constitution . . . prohibits the exclusion of defense

2    evidence under rules that serve no legitimate purpose or that are

3    disproportionate to the ends that they are asserted to promote, well-

4    established rules of evidence permit trial judges to exclude evidence

5    if its probative value is outweighed by certain other factors such as

6    unfair prejudice, confusion of the issues, or potential to mislead the

7    jury."  Holmes v. South Carolina, 547 U.S. at 320 (citations omitted);

8    see also Moses v. Payne, 555 F.3d 742, 758 (9th Cir. 2009).  Thus,

9    "the Constitution permits judges to exclude evidence that is

10   repetitive . . . , only marginally relevant or poses an undue risk of

11   harassment, prejudice or confusion of the issues."  Holmes v. South

12   Carolina, 547 U.S. at 326-27 (citations, internal brackets and

13   quotations omitted).

14

15   Petitioner relied on dictum in Park, 421 U.S. at 676-77, to argue

16   that her alleged impossibility evidence was relevant to a viable

17   defense.  In Park, the Supreme Court held that the Federal Food, Drug

18   and Cosmetic Act, 21 U.S.C. § 301(k), imposed on corporate agents not

19   only the duty to seek out and remedy violations, but also the duty to

20   implement measures to ensure that violations will not occur.  Park,

21   421 U.S. at 673-74.  The Court observed that a requested instruction

22   on "objective impossibility" or lack of "power or capacity" should be

23   given if a defendant first presents sufficient evidence to put such a

24   defense at issue.  See United States v. Y. Hata & Company, Ltd., 535

25   F.2d 508, 510-11 (9th Cir. 1976), cert. denied, 429 U.S. 828 (1976)

26   ("Hata") (discussing same).

27   ///

28   ///

1   While _Park_ suggests that responsible corporate agents may raise a

2   defense of powerlessness to prevent or correct a violation, (citing

3   _United States v. Weisenfeld Warehouse Co._, 376 U.S. 86, 91 (1964)),

4   _Park_ makes clear that there must be sufficient supporting evidence to

5   do so.  _Park_, 421 U.S. at 673, 677.  What is required is more than

6   merely a showing that the responsible party did not cause a violation

7   or that some efforts to remedy a violation were frustrated.  _See_

8   _United States v. Starr_, 535 F.2d 512, 515 (9th Cir. 1976) (allegations

9   that food violations were due to "natural phenomenon" of vermin

10  fleeing a nearby plowed field to contaminate a warehouse, and

11  subsequent sabotage of corrective efforts by a third party, did not

12  negate the warehouser's duty of "foresight and diligence" to support

13  an objective impossibility defense); _Hata_, 535 F.2d at 511 (assuming,

14  _arguendo_, that _Park_ impossibility defense is available to an

15  individual, allegations that repair attempts were unsuccessful would

16  not support impossibility defense).

17

18  In the present case, regardless of whether the tenants originally

19  caused the violations or frustrated some of Petitioner's alleged

20  efforts to remedy the violations, Petitioner's offer of proof fell far

21  short of a sufficient showing that it had been impossible for

22  Petitioner to correct the violations.  Petitioner stipulated that she

23  was the owner, manager or person in control of the property (R.T.

24  405).  In this capacity, Petitioner was responsible for maintenance of

25  the properties and for remedying the identified violations.  "The

26  accused, if [s]he does not will the violation, usually is in a

27  position to prevent it with no more care than society might reasonably

28  expect and no more exertion than it might reasonably exact from one

23

1  who assumed [her] responsibilities." Morissette, 342 U.S. at 256.

2  While Petitioner may have claimed that she was "powerless" to prevent

3  or correct the violations, the Appellate Division reasonably concluded

4  that Petitioner's offer of proof was inadequate to support such a

5  claim:

6

7      Although [Petitioner] blamed some of her tenants for the

8      state of the building, her offer of proof did not include

9      any unsuccessful efforts to take corrective [action] against

10     the offending tenants.  The premises were subject to rent

11     control and, as such, the landlord was authorized to evict a

12     tenant who damages either his/her unit, the unit's

13     appurtenances, or the common areas of the building.  (Los

14     Angeles Municipal Code § 151.09.A.3).  Under the facts of

15     this case, in the absence of evidence that it was

16     objectively impossible for [Petitioner] to take corrective

17     action against the complained of tenants, her offer of proof

18     was inadequate as a matter of law.

19

20  See Respondent's Lodgment 7 at 8-10.  The Court agrees that

21  Petitioner's offer of proof fell far short of the required showing of

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1   objective impossibility.[9]  For the same reason, the exclusion of

2   Petitioner's scant proffered evidence relevant to a purported

3   objective impossibility defense had no "substantial and injurious

4   effect or influence in determining the jury's verdict."  Brecht v.

5   Abrahamson, 507 U.S. 619, 637-38 (1993) (federal habeas relief

6   unavailable for trial-type errors that are not of "substantial and

7   injurious effect"); see Fry v. Pliler, 551 U.S. 112 (2007) (Brecht

8   standard applies to federal habeas review of Chambers errors).

9   ///

10   ///

11   ///

12   ///

13   _____

14         [9]     In her Supplemental Reply, Petitioner argues for the
     first time that the prosecution violated Brady v. Maryland, 373
15   U.S. 83 (1963) ("Brady") by allegedly suppressing evidence that
     Petitioner purportedly had been targeted by a law firm
16   specializing in tenant rights (Supplemental Reply, pp. 1-2).
     Under Brady, the suppression by the prosecution of evidence
17   favorable to an accused violates due process "where the evidence
     is material either to guilt or to punishment. . . ."  Id. at 87.
18   Suppressed evidence is material under Brady if there is a
     reasonable probability that, had the evidence been disclosed to
19   the defense, the result of the proceeding would have been
     different.  Kyles v. Whitley, 514 U.S. 419, 433 (1995).
20
           Given the strict liability nature of the subject offenses,
21   as discussed above, there plainly exists no reasonable
     probability that introduction of the allegedly suppressed
22   evidence would have altered the result of Petitioner's trial.
     Whether the defense theory should be characterized as
23   "impossibility," "obstruction," or something else, the result of
     the trial doubtlessly would have remained the same even if the
24   alleged suppression of evidence had not taken place.  The obvious
     lack of merit of Petitioner's belated Brady claim obviates any
25   need to analyze whether the claim is exhausted or unexhausted.
     See Cassett v. Stewart, 406 F.3d 614, 623-24 (9th Cir. 2005),
26   cert. denied, 546 U.S. 1172 (2006) (habeas court may deny on the
     merits unexhausted claim that is not "colorable").
27

28

1 | **RECOMMENDATION**

3      For the all of the foregoing reasons, IT IS RECOMMENDED that the
4 Court issue an Order: (1) accepting and adopting this Report and
5 Recommendation; and (2) denying and dismissing the Petition with
6 prejudice.

8      DATED: June 6, 2012.

11                  /S/
                CHARLES F. EICK
12        UNITED STATES MAGISTRATE JUDGE

1 **NOTICE**

2      Reports and Recommendations are not appealable to the Court of

3 Appeals, but may be subject to the right of any party to file

4 objections as provided in the Local Rules Governing the Duties of

5 Magistrate Judges and review by the District Judge whose initials

6 appear in the docket number.  No notice of appeal pursuant to the

7 Federal Rules of Appellate Procedure should be filed until entry of

8 the judgment of the District Court.

9      If the District Judge enters judgment adverse to Petitioner, the

10 District Judge will, at the same time, issue or deny a certificate of

11 appealability.  Within twenty (20) days of the filing of this Report

12 and Recommendation, the parties may file written arguments regarding

13 whether a certificate of appealability should issue.